## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

JALISHA BRAXTON, *et al.*,

     Plaintiffs,

     v.

LIDESLAMBOUS, INC., *et al.*,

     Defendants.

Case No. 4:24-cv-119

## OPINION & ORDER

The plaintiffs—former servers at Captain George's Williamsburg, Virginia restaurant—filed this hybrid collective and class action against the restaurant's owners and corporate entity alleging claims for unpaid wages under federal and state law. The defendants filed a partial motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 28), arguing all claims against Sharon Pitsilides should be dismissed because she is not an "employer" under the relevant laws, ECF No. 29 at 4–6, and that the plaintiffs fail to sufficiently plead their unpaid wage claims based on allegations of an improper tip pool and non-tipped labor, *id.* at 6–11.

The plaintiffs now seek to file a third amended complaint—more than five months after the scheduling order deadline for motions to amend the pleadings under Fed. R. Civ. P. 15(a)(2)—to add facts allegedly learned during discovery. ECF Nos. 54 (motion), 55 (memorandum), 55-1 (proposed third amended complaint).

The Court will:

- grant the plaintiffs leave to add details regarding managers' knowledge about the walkouts policy, remove references to overtime claims, correct named plaintiffs' addresses, and implement other minor revisions, because permitted amendments relate back in legal effect to the date this action commenced;

- deny the plaintiffs' request to add details relating to an improper tip pool and non-tipped labor—and as to these allegations, grant the defendants' motion to dismiss, with prejudice;[1] and

- deny the defendants' motion to dismiss as to the employer status of Sharon Pitsilides.

Finally, the Court will consider the plaintiffs' motion to certify a class and conditionally certify a collective, only as to the theories that remain after resolution of the motion to amend and the motion to dismiss. The motion to certify a class (ECF No. 41) will be denied.

## I.    BACKGROUND

At this stage, the Court assumes the facts alleged in the proposed third amendment complaint are true. ECF No. 55-1. Plaintiffs Jalisha Braxton, Keith Sample, Hannah Morgan, Zach Portillo, and Robert Hamrick are former servers who

---

[1] Dismissal with prejudice is appropriate for two reasons. First, as to allegations of an improper tip pool and non-tipped labor, granting another opportunity to amend would be futile. The plaintiffs fail to demonstrate good cause to add details about the level of interaction busboys and cleaners had with customers, and without such information, the plaintiffs will not be able to cure the pleading deficiency for their allegation of an improper tip pool. And the plaintiffs can plead no set of facts that would save their allegations of non-tipped labor. *See Carter v. Norfolk Cmty. Hosp. Ass'n*, 761 F.2d 970, 974 (4th Cir. 1985) (when dismissing pursuant to Rule 12(b)(6), the determination whether to dismiss with or without prejudice is within the district court's discretion).

worked at Captain George's Seafood Restaurant in Williamsburg, Virginia for the three-year period prior to the original filing of this action. *Id.* ¶ 3. They received an hourly wage—$2.13, the tip credit rate—and tips. *Id.* ¶¶ 3, 28, 39. Captain George's is owned and operated by George and Sharon Pitsilides, who are registered agents and officers of Lideslambous, Inc., a Virginia corporation. *Id.* ¶¶ 12–14, 21–22.

In three counts, the plaintiffs bring federal and state claims alleging that, because certain policies and practices of the defendants rendered the defendants ineligible to take the tip credit under 29 U.S.C. § 203(m)(2), the plaintiffs are owed the full statutory minimum wage for all hours worked during the relevant period. ECF No. 55-1 ¶ 32. Count I is a putative collective action under the Fair Labor Standards Act (FLSA), alleging failure to pay minimum wages pursuant to 29 U.S.C. § 206. ECF No. 55-1 ¶¶ 60–65. Count II is a putative class action against all the defendants, alleging failure to pay minimum wages under the Virginia Minimum Wage Act (VMWA), Va. Code § 40.1-28.8. *Id.* ¶¶ 66–72. Count III is a putative class action against Defendant Lideslambous, alleging violations of the Virginia Wage Payment Act (VWPA), Va. Code § 40.1-29. *Id.* ¶¶ 73–78.

The plaintiffs advance four core theories in support of their contention that the defendants were ineligible to take the tip credit and therefore owe the plaintiffs the standard minimum wage. First, the plaintiffs assert there was an invalid tip pooling arrangement because employees who did not customarily receive tips were included in the pool, ECF No. 55-1 ¶ 31(g), and plaintiff servers were required to pay cash resources into the tip pool, *id.* ¶¶ 31(b) and (d). Second, the plaintiffs claim they did

not retain all their earned tips, because they were required to pay the defendants cash to cover the tabs of parties who walked out without paying their bills. *Id.* ¶ 31(c). Third, the plaintiffs allege the defendants took impermissible deductions from employees' wages and tips for lost or damaged property, including uniforms and point of sale cards. *Id.* ¶¶ 27, 31(f). And finally, the plaintiffs assert they were required to spend more than 20% of their work week and more than 30 continuous minutes performing non-tip-producing labor. *Id.* ¶¶ 27, 31(e).

The Court's Scheduling Order set a deadline of May 7, 2025, for motions to amend the pleadings pursuant to Fed. R. Civ. P. 15(a)(2). *See* ECF No. 27 ¶ II. The plaintiffs moved to file their third amended complaint on October 16, 2025. ECF No. 54. The plaintiffs propose to clarify and strengthen their existing claims with facts they represent were learned through the deposition testimony of three Captain George's managers. ECF No. 55 at 1–2; ECF No. 58 at 1–2.

Although the defendants' motion to dismiss only challenges the sufficiency of the plaintiffs' allegations of an invalid tip pool and non-tipped labor,[2] ECF No. 29 at

---

[2] The defendants' motion to dismiss does not address the plaintiffs' claims for minimum wages based on impermissible deductions. *See* ECF No. 29. But the Court has considered the sufficiency of such claims given its independent obligation to ensure the pleadings raise a right to relief such that the claim is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiffs' alleged payment of cash resources for walkouts, uniforms, and other restaurant property would necessarily have been taken—effectively, even if not directly—out of either the cash wage or tips exceeding the cash wage. Accordingly, the theory survives either because such payments reduced the plaintiffs' wages below the statutory minimum, or—in the alternative—because such payments violate 29 U.S.C. § 203(m)(2)(A) (requiring that tipped employees retain all their earned tips) and/or 29 U.S.C. § 203(m)(2)(B) (prohibiting tip theft).

4

1–2, 9–11, the defendants oppose the plaintiffs' motion to amend in its entirety, asserting that the plaintiffs fail to show good cause and that amendment would be futile and unfairly prejudicial, ECF No. 57 at 1–2.

Lastly, the plaintiffs seek to certify a class defined as:

> All current and former servers employed by the Defendants at Captain George's Williamsburg restaurant who, at any time from and including October 9, 2021, to the present date, were unlawfully denied full statutory minimum wages to which they were entitled under the FLSA, VMWA and VWPA.

ECF No. 42 at 13. They also ask for conditional certification of an FLSA collective defined as:

> All current and former servers employed by the Defendants at Captain George's Williamsburg restaurant who, at any time from and including October 9, 2021, to the present date, were unlawfully denied full statutory minimum wages to which they were entitled under the FLSA, VMWA and VWPA.

*Id.* at 26. The defendants oppose both requests. ECF No. 47.

## II.    LEGAL STANDARDS

### A.    Motions for Leave to Amend a Complaint

"[A]fter the deadlines provided by a scheduling order have passed," a plaintiff seeking to amend a complaint must demonstrate good cause pursuant to Fed. R. Civ. P. 16(b). *Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008). If the plaintiff demonstrates good cause to amend their complaint after the deadline set forth in the scheduling order, the Court must next complete the amendment analysis under Fed. R. Civ. P. 15. *Carlisle v. Allianz Life Ins. Co. of N. Am.*, 540 F. Supp. 3d 567, 572 (E.D. Va. 2021).

Fed R. Civ. P. 15(a) provides that a party may amend a pleading by leave of the court or by written consent of the adverse party and that "[t]he court should freely give leave [to amend] when justice so requires." Leave to amend "should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would [be] futile." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (citation and quotation marks omitted).

### i. *Good Cause*

The Fourth Circuit has not addressed in a published opinion what factors guide the good cause analysis in the context of a motion for leave to file an amended complaint after the deadline prescribed in a court's scheduling order. However, it has recognized in unpublished opinions that the "touchstone" of Fed. R. Civ. P. 16(b)(4)'s good cause standard is the diligence of the moving party. *Faulconer v. Centra Health, Inc.*, 808 F. App'x 148, 152 (4th Cir. 2020) (unpublished); *Montgomery v. Anne Arundel Cnty. Md.*, 182 F. App'x 156, 162 (4th Cir. 2006) (unpublished); *Cook v. Howard*, 484 F. App'x 805, 814–15 (4th Cir. 2012) (unpublished). Thus, the Court looks to whether the plaintiff acted diligently to comply with the Scheduling Order. *Cf. Cook*, 484 F. App'x at 815 ("[T]he good-cause standard will not be satisfied if the district court concludes that the party seeking relief . . . has not acted diligently in compliance with the schedule.") (alterations accepted).

Under that standard, good cause generally exists when some of the evidence a plaintiff needs to plead their claims did not come to light until after the amendment deadline. *See, e.g.*, *G. W. Aru, LLC v. W. R. Grace & Co.-Conn.*, 344 F.R.D. 446, 449

6

(D. Md. 2023); *Wonasue v. Univ. of Md. Alumni Ass'n*, 295 F.R.D. 104, 107 (D. Md. 2013); *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 768–69 (D. Md. 2010).

### ii. Prejudice

Prejudice is often determined by the nature of the amendment and its timing. *Laber*, 438 F.3d at 426. District courts in the Fourth Circuit require the party opposing amendment to demonstrate prejudice if it exists. *E.g., Atl. Bulk Carrier Corp. v. Milan Exp. Co.*, No. 3:10-cv-103, 2010 WL 2929612, at *4 (E.D. Va. July 23, 2010); *Hardwire, LLC v. Ebaugh*, No. 1:20-cv-304, 2021 WL 3809078, at *11 (D. Md. Aug. 26, 2021).

"A common example of a prejudicial amendment is one that raises a new legal theory that would require the gathering and analysis of facts not already considered by the defendant, and is offered shortly before or during trial." *Laber*, 438 F.3d at 427. On the other hand, an amendment is likely not prejudicial if "it merely adds an additional theory of recovery to the facts already ple[ade]d and is offered before any discovery has occurred." *Id.* "[A]bsence of prejudice, though not alone determinative, will normally warrant granting leave to amend." *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980) (allowance of the amendment could not prejudice the defendant, who "was from the outset made fully aware of the events giving rise to the action").

### iii. Bad Faith

Bad faith is "dishonesty of belief or purpose." *United States ex rel. Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 198 (4th Cir. 2022) (quoting Bad Faith,

BLACK'S LAW DICTIONARY (8th ed. 2004)) (quotation marks omitted and alterations accepted). It captures "act[ing] for the wrong reasons . . . lying, deceiving, playing unjustifiable hardball, slacking off, intentionally causing confusion, [] stubbornly refusing to follow rules," or even "noticing someone's mistake and saying nothing about it." *Id.*

### iv. *Futility*[3]

Courts deny leave to amend for futility when the proposed amendment is "clearly insufficient or frivolous on its face" or "fails to withstand Rule 12(b)(6) scrutiny." *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 750 (4th Cir. 2021). Such deficiencies must be "obvious on the face of the proposed amendment." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986). "To survive a [Fed. R. Civ. P. 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court "must take all the factual allegations in the complaint as true." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

### v. *Relation Back*

Pursuant to Fed. R. Civ. P. 15(c)(1)(B), "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or

---

[3] Because the futility analysis encompasses the Fed. R. Civ. P. 12(b)(6) standard applicable to the defendants' motion to dismiss, the Court does not include a separate section on that standard.

defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading[.]" "The purpose of Rule 15(c) is to provide the opportunity for a claim to be tried on its merits, rather than being dismissed on procedural technicalities, when the policy behind the statute of limitations has been addressed." 3 James Wm. Moore et al., *Moore's Federal Practice* § 15.19(3)(a) (3d ed. 1997); *see also Goodman v. Praxair, Inc.*, 494 F.3d 458, 468 (4th Cir. 2007). Therefore, when there is a "factual nexus" between the amendment and the original complaint, the amended claim will be "liberally construed to relate back to the original complaint if the defendant had notice of the claim and will not be prejudiced by the amendment." *Grattan v. Burnett*, 710 F.2d 160, 163 (4th Cir. 1983) (citing *Davis*, 615 F.2d at 614).

## B.    Minimum Wages Under the FMLA and VMWA

To state a claim for nonpayment of minimum wages under the FLSA and the VMWA,[4] a plaintiff must plausibly allege they did not receive "compensation equal to or exceeding the product of the total number of hours they worked and the statutory minimum hourly rate" during a given workweek. *Blankenship v. Thurston*

---

[4] The FLSA generally provides for a two-year statute of limitations; however, if an employer's actions are "willful"—meaning the employer "knew or showed reckless disregard for the matter of whether [their] conduct was prohibited by the [FLSA]," the limitations period increases to three years. *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 357–58 (4th Cir. 2011) (quotations and citations omitted); 29 U.S.C. § 255(a). The VMWA, however, is silent as to the applicable statute of limitations. *See* Va. Code Ann. §§ 40.1-28.8–40.1-28.12. Where a statute does not provide a limitations period, the Virginia General Assembly has assigned a two-year statute of limitations. Va. Code Ann. § 8.01-248; *Castillo-Guzman v. Triple Canopy, Inc.*, No. 1:15-cv-799, 2016 WL 899275, at *2 (E.D. Va. Mar. 2, 2016).

*Motor Lines, Inc.*, 415 F.2d 1193, 1198 (4th Cir. 1969) (quotation marks and citation omitted); *see* 29 U.S.C. § 206; Va. Code § 40.1-28.10.

Under the FLSA, an employer may take a credit against the otherwise required minimum wage[5] by counting an employee's tips as "wages." *Trejo v. Ryman Hospitality Properties, Inc.*, 795 F.3d 442, 447 (4th Cir. 2015); 29 U.S.C. § 203(m)(2)(A). An employer may "pay tipped employees [] a cash wage of $2.13[6] plus [] an additional amount in tips that brings the total wage to the federal minimum wage." *Trejo*, 795 F.3d at 447. An employer may not take a tip credit unless (1) the employer informs its employees of its use of the tip credit, and (2) all tips received by the employee are retained by the employee, except when participating in a tip pool with other employees who "customarily and regularly receive tips." 29 U.S.C. § 203(m)(2)(A). An employer who improperly claims a tip credit is liable to the affected

---

[5] At all relevant times, the VMWA provided that employees must be paid at a rate not less than the greater of the federal minimum wage or the Virginia minimum wage. Va. Code § 40.1-28.10(B)–(D). The Virginia minimum wage has been between $9.50 and $12.00 per hour, *see id.*, whereas the federal minimum wage under the FLSA has remained $7.25 per hour, 29 U.S.C. § 206(a)(1)(C). Accordingly, Virginia employers covered by the FLSA between October 2021 and October 2024 could take a maximum tip credit of between $7.37 and $9.87 to comply with state and federal law. 29 U.S.C. § 203(m)(2)(A); Va. Code § 40.1-28.10(B)–(D).

[6] Virginia law permits employers to take a tip credit but does not establish a maximum tip credit, as the FLSA does. Rather, under Virginia law, employers are required to ensure that the total compensation received by the employee, when the cash wage is combined with tips, equals or exceeds the statutory minimum wage. *See* Va. Code § 40.1-28.10 (prescribing minimum wage rate); *see also* Va. Code § 40.1-28.9 ("In determining the wage of a tipped employee, the amount paid such employee by his employer shall be deemed to be increased on account of tips . . . .").

employee(s) "in the amount of their unpaid minimum wages . . . and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).

## C.    Unpaid Wages Under the VWPA

The VWPA governs the payment of wages by employer entities to Virginia employees. Va. Code § 40.1-29. It mandates the method, frequency, and accounting of payments, Va. Code § 40.1-29(A)–(B), and stipulates that an employer may not "withhold any part of the wages or salaries of any employee except for payroll, wage or withholding taxes or in accordance with law, without written and signed authorization of the employee." Va. Code § 40.1-29(C). The VWPA provides for a private right of action to recover unpaid wages—individually, jointly, or as a collective action consistent with the procedures outlined under the FLSA, 29 U.S.C. § 216(b)— "if an employer[7] fails to pay wages to an employee."[8] Va. Code § 40.1-29(J).

---

[7] The definition of "employer" under the VWPA is narrower than under the FLSA and VMWA. Whereas the Virginia General Assembly "adopt[ed] the FLSA's choice of the word 'person'" in the VMWA, it intentionally declined to do so in the VMWA, instead using the word "entity." *Cornell v. Benedict*, 878 S.E.2d 191, 194–95 (Va. 2022). An "entity" is "an organization (such as a business [])  that has a legal identity apart from its members or owners." *Id.* at 195 (quoting BLACK'S LAW DICTIONARY 673 (11th ed. 2019)). For this reason, the plaintiffs' claim for unpaid wages under the VWPA is asserted solely against Lideslambous.

[8] Under the VWPA, the statute of limitations for a civil action is three years. Va. Code § 40.1-29(L). The VWPA does not require that the employer's failure to pay wages be willful. However, the VWPA provides for an additional award in "an amount equal to triple the amount of wages due and reasonable attorney fees and costs" where "the court finds that the employer knowingly failed to pay wages" in accordance with the VWPA. Va. Code § 40.1-29(J). An employer acts "knowingly" if it "(i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information, or (iii) acts in reckless disregard of the truth or falsity of the information," and "proof of specific intent to defraud" is not required. Va. Code § 40.1-29(K).

Accordingly, to plead a cause of action for recovery of unpaid wages under the VWPA, a plaintiff needs only to allege that the employer failed to pay all the wages the employee was owed under state and federal law.

### D.    Class Certification Under Fed. R. Civ. P. 23

The Court must determine "[a]t an early practicable time" whether a class action can be maintained. Fed. R. Civ. P. 23(c)(1)(A). Rule 23 provides four prerequisites to certify a class:

(1)    the class is so numerous that joinder of all members is impracticable;

(2)    there are questions of law or fact common to the class;

(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)    the representative parties will fairly and adequately protect the interests of the class.

(numerosity, commonality, typicality, and adequacy, respectively) Fed. R. Civ. P. 23(a).

Additionally, the Fourth Circuit recognizes an implicit threshold requirement that the members of a proposed class be "readily identifiable." *EQT Production Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014); *see Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972). For a district court to certify a class action, it must be able to "readily identify the class members in reference to objective criteria." *EQT*, 764 F.3d at 358. "[I]f class members are impossible to identify without extensive and individualized

fact-finding or 'mini-trials,' then a class action is inappropriate." *Id.* (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (4th Cir. 2012)).

The party moving for class certification bears the burden of establishing that each of these requirements is met. *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001).

### E.    Conditional Certification of FLSA Collective Actions

Certification of an FLSA collective requires the representative plaintiffs to show that they and the other members of the putative collective are "similarly situated." 29 U.S.C. § 216(b). The statute does not define 'similarly situated,' and the Fourth Circuit has not done so either.

To determine whether employees are similarly situated to the named plaintiffs bringing an action, "district courts within the Fourth Circuit have uniformly followed the [two-step] approach set forth in *Lusardi* . . . ." *Thomas v. Maximus, Inc.*, No. 3:21-cv-498, 2022 WL 1482010, at *2, 5–6 (E.D. Va. May 10, 2022) (quotation marks omitted) (citing *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987)) (applying the two-step approach and permitting an interlocutory appeal to resolve ambiguity as to the applicable standard for certifying collective actions); *see Maximus, Inc. v. Thomas*, No. 22-185 (4th Cir. July 7, 2022) (denying review). The two-step approach consists of (1) the "notice" or "conditional [] certification" stage and (2) the "decertification" stage. *Thomas*, 2022 WL 1482010, at *2. This suit is before the Court at step one—the notice stage.

During the notice stage, courts determine whether the proposed collective action is "similarly situated" to the named plaintiffs "with respect to the legal and, to a lesser extent, the factual issues to be determined." *Winks v. Va. Dep't of Transp.*, No. 3:20-cv-420, 2021 WL 2482680, at *2 (E.D. Va. June 17, 2021); *Choimbol v. Fairfield Resorts, Inc.*, 475 F. Supp. 2d 557, 563 (E.D. Va. 2006). That requirement aims to address collective-wide claims while avoiding "becoming bogged down by individual differences among [putative collective] members." *Houston v. URS Corp.*, 591 F. Supp. 2d 827, 832 (E.D. Va. 2008). Thus, at this stage, the plaintiff's burden is relatively lenient. *Id.*

However, the plaintiffs must still make a "modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Purdham v. Fairfax Cnty. Pub. Schs.*, 629 F. Supp. 2d 544, 548 (E.D. Va. 2009) (quotation marks omitted) (quoting *Choimbol*, 475 F. Supp. 2d at 563). This factual showing must be supported by "affidavits or other means" and be more than "vague allegations." *Njoroge v. PrimaCare Partners*, LLC, No. 1:22-cv-425, 2022 WL 4465894, at *3 (D. Md. Sept. 26, 2022). However, to decide whether a plaintiff has carried their burden at this stage, a court "does not resolve factual disputes, decide substantive issues, or evaluate credibility." *Chapman v. Saber Healthcare Grp., LLC*, 623 F. Supp. 3d 664, 672 (E.D. Va. 2022) (citation omitted).

## III.    ANALYSIS

### A.    Motion for Leave to Amend the Complaint

#### i.    *Improper Tip Pool*

The plaintiffs seek to add three pieces of information to "amplify and clarify" their allegation that they are owed unpaid wages because the defendants maintained an improper tip pool. *See* ECF No. 55 at 1. The plaintiffs seek to expand the list of customarily non-tipped employees included in the tip pool to include buffet runners and bartenders, ECF No. 55-1 ¶ 31(g); add that the buffet runners, bartenders, busboys, and cleaners had "little to no contact or interaction with customers," *id.*; and add that the restaurant calculated the servers' required tip pool contributions based on a percentage of gross sales (between 2.75% and 3% depending on the date), *id.* ¶ 31(b).

The plaintiffs do not establish good cause to amend their complaint with respect to the new tip pool details, as they have not acted diligently to comply with the Scheduling Order. The plaintiffs contend that they learned of the proposed tip pool amendments only through deposition testimony in late September 2025, ECF No. 58 at 1; however, their explanation does not pass muster.

As an initial matter, common sense dictates that the plaintiff servers have from the outset been well-positioned to know the tip pool facts they claim to have recently discovered. Even granting the plaintiffs the benefit of the doubt that they did not know which categories of employees were included in the tip pool, it seems unlikely that the plaintiffs were not aware they were personally contributing between

2.75% and 3% of their gross sales to the tip pool at the end of each shift they worked. And it is wholly implausible that the plaintiffs did not have occasion to observe the level of interaction busboys and cleaners (the categories of employees included in the second amended complaint) had with customers.

But the Court is not required to rely on common sense. Evidence submitted by the defendants indicates that the plaintiffs possessed information about which categories of employees were included in the tip pool and how tip out contributions were calculated by at least April 2025, when the defendants provided their initial disclosures, including a document entitled "Tip Credit Notice." *See* ECF No. 57 at 5; ECF No. 57-1. That document explains that buffet runners, bussers, and bartenders are included in the tip pool, ECF No. 57-1 at 2–3, and states that servers keep all their tips "except the amount that servers are required to 'tip out'"—"2.75% of their total daily sales," *id.* at 3.

The plaintiffs also provided the Court with evidence that the proposed amendments do not involve newly discovered information. The July 2025 declaration of Jalisha Braxton states the "tip pool arrangement was such that [the defendants] kept a percentage of each server's total sales as opposed to a percentage of their tips[,]" "[t]he percentage was at least three percent[,]" and "[t]hey used this pool of money to pay bussers', setters', buffet runners', and bartenders' wages." ECF No. 42-1 at 5 ¶ 7. The declaration further explains that "[b]artenders . . . did not interact with the public" because "[t]here was no bar" and the "servers would actually bring

16

the drinks to the tables." *Id.* The declaration of Robert Hamrick provides the same information. *See* ECF No. 42-2 at 3 ¶ 5.

The plaintiffs do not attempt to explain why they waited so long to amend their complaint to include details they had in their possession all along. Instead, they endeavor to mislead the Court into believing this is newly discovered information that the "[d]efendants possessed all along but emerged only through deposition testimony in late September 2025" (the transcripts of which this Court has not been provided with), and that they filed the instant motion a mere sixteen days later. ECF No. 58 at 1. And the plaintiffs also suggest that the content of the amendments was in the sole possession of the managers because it involves "direct evidence of [the managers'] actual knowledge." *Id.* But the amendments to the tip pool theory make no mention of what knowledge the managers possessed. *See* ECF No. 55-1 ¶¶ 31(b), (d), (g). And, tellingly, the plaintiffs' good cause analysis makes no mention of the tip pool. ECF No. 58 at 6–9. This is not the type of diligence—or candor[9]—Rule 16(b)'s good cause standard contemplates.

---

[9] To determine whether good cause exists under Fed. R. Civ. P. 16(b)(4), district courts within the Fourth Circuit sometimes consider "whether the moving party acted in good faith, the length of the delay and its effects, and whether the delay will prejudice the non-moving party." *G. W. Aru LLC v. W. R. Grace & Co.-Conn.*, 344 F.R.D. 446, 449 (D. Md. 2023); *RLI Ins. Co. v. Nexus Servs., Inc.*, No. 5:18-cv-66, 2019 WL 1880148, at *2 (W.D. Va. Apr. 26, 2019); *Ademiluyi v. PennyMac Mortg. Inv. Trudt Holdings*, No. 1:12-cv-752, 2015 WL 575362, at *5 (D. Md. Feb. 10, 2015). Although this Court need not make a finding as to whether the plaintiffs have acted with "dishonesty of belief or purpose," *MedCom Carolinas, Inc.*, 42 F.4th at 198, the Court notes that the plaintiffs' representations are troubling.

Accordingly, the plaintiffs have not satisfied good cause to amend the complaint with respect to their allegations of an improper tip pool. Because the plaintiffs have not demonstrated good cause to amend their complaint after the deadline set forth in the Scheduling Order, the Court need not reach the analysis under Fed. R. Civ. P. 15. *Carlisle*, 540 F. Supp. 3d at 572. The plaintiffs' proposed amendments to their allegations of an improper tip pool will be denied.

### ii.    *Tip Retention for Walkouts*

#### a.    *Good Cause*

In support of their theory that servers were required to cover walkout tabs, the plaintiffs seek to add that three Captain George's managers had actual knowledge of that policy and practice. ECF No. 55-1 ¶ 31(c); See ECF No. 58 at 6. The plaintiffs meet their burden to establish good cause to amend because they acted within a reasonable time after learning of new facts during the discovery period.

The plaintiffs represent that newly acquired evidence regarding the managers' knowledge of the walkouts policy was acquired during depositions in late September 2025, and the plaintiffs moved to amend sixteen days later. ECF No. 58 at 1–2, 4. The plaintiffs further represent that this "critical evidence" was in the defendants' possession "all along," but previously "no document provided this information" and "no interrogatory response [] can substitute for this testimony." *Id.* at 1–2. Although the plaintiffs' Second Amended Complaint alleged that the defendants should have known of the practice of requiring servers to pay to cover walkout tabs, the plaintiffs assert that the managers' depositions for the first time provided direct evidence of

actual knowledge, which the plaintiffs assert is imputed to the defendants. ECF No. 58 at 6; ECF No. 55-1 ¶ 31(c).

Though the defendants argue the plaintiffs have known about—and lacked diligence as to—several other categories of proposed amendments, the defendants do not argue a lack of diligence regarding "what knowledge managers had of servers paying for customer walkouts." *See* ECF No. 57 at 5 (stating that of the four substantive ways the plaintiffs seek to amend, the plaintiffs have known about three since at least April 2025). Instead, the defendants argue that the new facts about the managers' knowledge "do[ ]n't really inject anything new into their claim" because the plaintiffs' Second Amended Complaint already states that the defendants' practices and policies were "committed knowingly and willfully." *Id*. But whether the defendants are "left to wonder how adding [the proposed amended facts] . . . would make much of a difference" is not the relevant analysis[10]—and also suggests that allowing the amendment will not prejudice the defendants, as addressed below.

Becuase it appears the plaintiffs acted within a reasonable time after learning of new facts relevant to an existing claim, and the defendants do not contest that the

---

[10] As the plaintiffs seek relief for the three-year period prior to the original filing of this action on October 9, 2024, they are required to demonstrate that the defendants' actions are willful. 29 U.S.C. § 255(a) (providing for a two-year statute of limitations for FLSA violations, "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued"). Additionally, willful violations of the FLSA may subject an employer to civil penalties, *see* 29 U.S.C. § 216(e). Likewise, a knowing and intentional violation of the VMWA triggers penalties, Va. Code. § 40.1-28.11, and the VWPA provides for an additional award in "an amount equal to triple the amount of wages due and reasonable attorney fees and costs" where "the court finds that the employer knowingly failed to pay wages," Va. Code § 40.1-29(J).

plaintiffs have established good cause, the Court finds that the plaintiffs have met their burden under Fed. R. Civ. P. 16(b).

### b.    *Prejudice*

Despite their argument to the contrary, the defendants will not suffer prejudice if amendment is permitted, given the nature of the proposed amendment. *Laber*, 438 F.3d at 426.

The proposed amendment does not raise a new legal theory; rather, it merely builds upon an existing theory with facts that "convert allegations of constructive knowledge into direct evidence of actual knowledge." ECF No. 58 at 1. Thus, the amendment does not "take the defendant[s] by surprise or require [them] to investigate a claim of which [they were] not already cognizant." *Island Creek Coal Co. v. Lake Shore, Inc.*, 832 F.2d 274, 280 (4th Cir. 1987). And given the limited nature of the amendment, it does not appear to the Court that additional discovery would be necessary.

The absence of prejudice to the defendants weighs in strong favor of granting leave to amend. *See Davis*, 615 F.2d at 613.

### c.    *Futility*

Finally, the plaintiffs' proposed amendments would not be futile because the proposed revised facts support claims that pass muster under Fed. R. Civ. P. 12(b)(6).

Under 29 U.S.C. § 203(m)(2)(A), an employee must retain all their earned tips, except insofar as the employee participates in a proper tip pool. According to the plaintiffs, the defendants maintained a policy that required servers to pay cash to the

defendants—out of tips "and other server resources"—to cover walkout tabs, or else face "discipline up to and including termination." ECF No. 55-1 ¶ 31(c). The defendants "received thousands of dollars in such payments" from the plaintiffs and putative plaintiff servers. *Id.* The current general manager, along with two current front of the house managers, were subjected to the walkout policy while working as servers prior to their promotion, and they paid "personal cash" to cover walkout tabs. *Id.* And at all relevant times, these managers "had actual knowledge that servers were continuing to pay the restaurant" to cover walkout tabs. *Id.*

To the extent the plaintiffs state they were required to relinquish earned tips[11] to management to cover walkout tabs, they have sufficiently pleaded that the defendants took an improper tip credit,[12] and, as a result, that the defendants paid the plaintiffs a sub-minimum wage of $2.13 and owe the plaintiffs the difference between the wages paid and the applicable statutory minimum wage for all hours worked. *See Frechette v. Zia Taqueria, LLC*, 2:18-cv-3208, 2020 WL 13617433 (D.S.C. Apr. 7, 2020) (explaining that, because violation of § 203(m)(2)(A) disqualifies an employer from claiming a tip credit to satisfy the minimum wage obligation, "the

---

[11] Regarding the plaintiffs' statement that they also paid out of "other server resources" to cover the walkout tabs, this allegation survives for the same reason that their allegations of impermissible deductions based on payment of cash resources survives. *See supra*, n.2.

[12] Under the "Applicable Law" section of their complaint, the plaintiffs emphasize 29 U.S.C. § 203(m)(2)(B), which provides that "[a]n employer may not keep tips received by its employees *for any purposes*, including allowing managers or supervisors to keep any portion of employees' tips, *regardless of whether or not the employer takes a tip credit*." ECF No. 55-1 ¶ 23 (emphasis added). To the extent the plaintiffs also seek to advance a claim for tip theft under this provision, this claim survives for the same reasons that the allegations regarding tip retention survive.

amount of tips an employee earned is irrelevant because the employer is still liable for the difference between [their] employee's base salary and the minimum wage").

Accordingly, the plaintiffs' proposed revisions to the allegations of tip retention and tip theft due to the purported walkouts policy will be granted. Because the defendants "had notice of the claim and will not be prejudiced by the amendment," *Grattan*, 710 F.2d at 163, the amendment relates back in legal effect to the date of the commencement of this action. Fed. R. Civ. P. 15(c)(1)(B).

### iii.    *Non-Tipped Labor*

With respect to the plaintiffs' allegation that they are owed a full minimum wage for time spent performing untipped work in excess of 20% or when such work exceeded a continuous period of 30 minutes, the plaintiffs only seek to revise their claim to reflect that they "worked numerous weeks" where they spent more than 35% of their work time performing non-tipped labor, instead of "significantly more than 20%" of the time, as previously alleged. ECF No. 55-1 ¶ 31(e). The Court need not reach the merits of the plaintiffs' motion to amend with respect to this allegation because it does not survive scrutiny under Fed. R. Civ. P. 12(b)(6), *see infra* Part III.B.ii, since alleging a violation of the Department of Labor's (DOL) 80/20/30 Final Rule does not state a claim under the FLSA. Accordingly, the plaintiffs' proposed amendments to allegations of non-tipped labor will be denied.

### iv.    *Miscellaneous Other Amendments*

The proposed third amended complaint also clarifies that the plaintiffs are no longer pursuing overtime claims under the FLSA, includes corrections to four out of

five of the named plaintiffs' residences, ECF No. 55-1 ¶¶ 16–20, and proposes other minor edits—wording, grammar, revised minimum wage figures, and subtle background additions—to existing paragraphs. As to at least some of these proposed changes, it is not clear that the plaintiffs acted diligently. With respect to removing references to federal overtime claims, the plaintiffs do not explain why they waited until this late juncture to do so. The plaintiffs voluntarily moved to dismiss their state overtime claims in July 2025, and their failure to include the FLSA overtime claims in that motion is likely the product of oversight. Nevertheless, the Court will allow the plaintiffs to clean up the complaint given efficiency considerations and the defendants' lack of objection, and such amendments will relate back to the original complaint.

### B.   Motion to Dismiss

#### i.   *Improper Tip Pool*

The plaintiffs insufficiently plead their claim for unpaid wages based on allegations of an improper tip pool.

An employer may not take a tip credit unless all tips received by the employee are retained by the employee, except when participating in a tip pool with other employees who "customarily and regularly receive tips." 29 U.S.C. § 203(m)(2)(A). The plaintiffs allege that the defendants forced them to participate in an improper tip pool by including "customarily non-tipped busboys and cleaners" in the pool. ECF No. 26 ¶ 32(g).

Although the Fourth Circuit "has not addressed the question of when an employee is deemed to receive tips customarily and regularly, those that have [done

so] analyze the employee's job duties rather than the employee's job description." *Wai Man Tom v. Hospitality Ventures LLC*, 980 F.3d 1027, 1040 (4th Cir. 2020) (citing *Montano v. Montrose Rest. Assocs., Inc.*, 800 F.3d 186, 191 (5th Cir. 2015) ("Labels are easily molded to fit a party's goals and cannot be determinative of whether an employee customarily and regularly receives tips.")). The Fourth Circuit has applied the test from its sister circuits, which entails "look[ing] to whether the employee ha[s] more than de minimis interaction with the customers in an industry in which undesignated tips are common." *Id.* (quotations and citation omitted). Thus, the plaintiffs must allege facts that allow this Court to reasonably infer that individuals with whom the plaintiffs shared the tip pool did not have more than de minimis interaction with customers.

The plaintiffs' second amended complaint merely contains the conclusory statement that the busboys and cleaners were "customarily non-tipped" employees. ECF No. 26 ¶ 32(g). Although the proposed third amended complaint adds that the busboys and cleaners "had little or no contact or interaction with customers," ECF No. 55-1 ¶ 31(g), because the plaintiffs fail to establish good cause for such amendment, *see supra* Part III.A.i., the Court will not consider this information. Therefore, the plaintiffs have not alleged facts that allow this Court to reasonably infer that the busboys and cleaners with whom the plaintiffs shared the tip pool did not have more than de minimis interaction with customers,[13] *Wai Man Tom*, 980 F.3d

_____

[13] The defendants argue that the plaintiffs' contention that busboys and cleaners are customarily non-tipped employees is defective as a matter of law because the DOL considers "front of the house" employees, such as bussers, as the type of employees

24

at 1040, and the allegation of an improper tip pool based on the inclusion of busboys and cleaners fails to satisfy Fed. R. Civ. P. 12(b)(6).

The plaintiffs also appear to assert an improper tip pool based upon being required to tip out between "$25 to $75 and sometimes more" in cash resources at the end of their shift when working the restaurant's large rooms "where large groups of diners are served" and significant tips can be earned. ECF No. 26 ¶ 32(c). As a result, the plaintiffs would leave the restaurant with less cash than they had when they arrived and would have to "wait until the next regularly scheduled pay date to receive their earned tips." *Id.*

The plaintiffs attempt to plead a violation of the FLSA based on 29 C.F.R. § 531.54,[14] which the plaintiffs assert "limits a tip pool to a portion of *tips* actually received by the server during the shift." ECF No. 55-1 ¶ 31(b). But nothing in the text

---

who can share in a tip pool. ECF No. 29 at 9; *see* DOL, Wage and Hour Division, *Fact Sheet #15: Tipped Employees Under the Fair Labor Standards Act*, https://www.dol.gov/agencies/whd/fact-sheets/15-tipped-employees-flsa (last visited Jan. 26, 2026). Under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412–13 (2024), this Court may not defer to the DOL's extratextual guidance. Instead, this Court must apply the Fourth Circuit's standard for what it means to customarily and regularly receive tips, a fact-specific inquiry that turns on the duties of the bussers and cleaners rather than on their job title alone. *See Montano*, 800 F.3d at 191.

[14] The Court infers this is the basis for the plaintiffs' argument based upon a closely-related allegation in the plaintiffs' proposed third amended complaint. There, the plaintiffs' endeavor to add that servers were required to contribute a percentage of gross sales—between 2.75% and 3%—into the tip pool at the end of each shift, in violation of 29 C.F.R. § 531.54. ECF No. 55-1 ¶ 31(b). Although the amendment will not be considered given the plaintiffs' failure to demonstrate good cause, that allegation fails to state a claim upon which relief could be granted for the same reason that the plaintiffs fail to state a claim based on the allegation of cash tip outs when working the large rooms.

of the FLSA—or 29 C.F.R. § 531.54—prohibits tip pool contributions *based on* a percentage of gross sales, insofar as such contributions do not exceed the amount of tips actually received by the employee for any given shift. *See* 29 U.S.C. § 203(m)(2). Instead, the FLSA requires that tipped employees receive a cash wage plus earned tips that equal at least the statutory minimum wage for each hour worked, and that all tips received by an employee must be retained by the employee except when participating in a valid tip pool. 29 U.S.C. § 203(m)(2). And consistent with that requirement, 29 C.F.R. § 531.54 states that "[a]n employer that facilitates tip pooling by collecting and redistributing employees' tips does not violate section 3(m)(2)(B)'s prohibition against keepings tips if it fully distributes any tips the employer collects no later than . . . the regular payday for the workweek in which the tips were collected."

The plaintiffs fail to sufficiently state a claim for an improper tip pool under the FLSA based on the alleged tip out policy. The plaintiffs do not assert that the funds they contributed to the tip pool ever exceeded the earned tips they were ultimately paid out for any given shift, or that the combination of their cash wage and the tips ultimately distributed ever fell below the statutory minimum wage. And the plaintiffs also do not assert that the defendants retained the tip pool contributions; rather, the plaintiffs plead that the funds were returned to them, along with their portion of earned tips, on the next regularly scheduled pay date, consistent with 29 C.F.R. § 531.54 guidance. ECF No. 26 ¶ 32(c). Whether the plaintiffs chose to contribute to the tip pool out of cash tips received during the day's shift or out of cash

26

previously obtained is a distinction without a difference under the FLSA. Accordingly, the plaintiffs' minimum wage claim based on the tip out policy fails.

### ii.    *Non-Tipped Labor*

To the extent the plaintiffs attempt to plead a violation of the FLSA based on the DOL regulation known as the "80/20/30 Final Rule" rather than meeting the requirements of the statute, the plaintiffs have failed to sufficiently plead their claim.

The DOL's sub-regulatory guidance known as the "80/20/30 Final Rule" allowed[15] employers to "take a tip credit for work performed by a tipped employee" only when that work was "part of the employee's tipped occupation." 29 C.F.R. § 531.56(f) (2021). The DOL defined three categories of work in the Final Rule: (1) "tip-producing work" (e.g., a server providing table service); (2) "directly supporting work" (e.g., a server setting and bussing tables); and (3) "work that is not part of the tipped occupation" (e.g., a server preparing food). 29 C.F.R. § 531.56(f) (2021); *see Rest. Law Ctr.r*, 120 F.4th at 167 (explaining the Final Rule). An employer could take the tip credit for time employees spent on tip-producing work and directly supporting work, if the directly supporting work did not exceed 20% of the employees' workweek. 29 C.F.R. § 531.56(f)(4) (2021). However, "if a tipped employee perform[ed] directly

---

[15] The past tense is used to describe the 80/20/30 Final Rule because it no longer exists. After the Fifth Circuit ruled that the Final Rule was contrary to the FLSA's clear statutory text, *see Rest. Law Ctr. v. U.S. Dept. of Labor*, 120 F.4th 163 (5th Cir. 2024), the DOL removed the Final Rule from the Code of Federal Regulations. Tip Regulations Under the Fair Labor Standards Act (FLSA); Restoration of Regulatory Language, 89 Fed. Reg. 101,884 (Dec. 17, 2024). However, the Final Rule was in place at the time of the conduct alleged in this case.

supporting work for a continuous period of time that exceed[ed] 30 minutes, the employer [could] not take a tip credit for any time that exceed[ed] 30 minutes." *Id.*

The plaintiffs claim that the defendants required servers to spend a substantial amount of time, in excess of 20% and/or for a continuous period of time exceeding 30 minutes, performing non-tip producing, supporting work such as: "cleaning tables, cleaning floors, cleaning the buffet, setting out silverware, setting out plates, preparing silverware and plates, and similar non-tipped work for $2.13 per hour." ECF No. 26 ¶¶ 28, 32(d). And once monthly, the plaintiffs were required to come in "45 minutes to one and one-half hours before tip-producing work began to clean." *Id.* ¶ 28. Accordingly, the plaintiff servers contend that they should have been paid a full minimum wage for their time spent performing untipped work in excess of 20 percent or when such work exceeded a continuous period of 30 minutes. *Id.*

Nothing in the text of the FLSA prohibits employers from taking the tip credit when their tipped employees perform untipped duties. Instead, access to the credit is based on whether a given employee is "engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips."[16] 29 U.S.C. § 203(t) (definition of "tipped employee"). The distinction between tipped and untipped duties is only present in the 80/20/30 Final Rule—not in the FLSA itself. Therefore, the Court must evaluate whether the violations of the Final Rule that the plaintiffs allege are sufficient to state a claim under the FLSA.

---

[16] Likewise, under the VMWA, a "tipped employee" is one "who in the course of employment customarily and regularly receives tips totaling more than $30 each month from persons other than the employee's employer." Va. Code § 40.1-28.9.

Alleging a Final Rule violation would be sufficient to state a claim only if (1) Congress delegated authority to the DOL to define "occupation" and the Final Rule was within the scope of that authority, *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 413 (2024); or (2) despite no such delegation of authority, the Final Rule happened to agree with the "best reading" of the FLSA, *id.* at 400; *see id.* at 392 ("Under the [Administrative Procedures Act], it [is] the responsibility of the court to decide whether the law means what the agency says.") (quotation marks and citation omitted); *see also United States v. Kokinda*, 146 F.4th 405, 418 (4th Cir. 2025) (observing that after *Loper Bright*, an agency's interpretation can "retain the power to persuade and provide useful guidance on the correct definition" of a term). In either case, the Court must "exercise [its] independent judgment in deciding whether [the DOL] has acted within its statutory authority"—which the Court does by interpreting the FLSA to determine the "best reading" of the statute. *Loper Bright* at 400, 412. This determination must "start with the statutory text." *Tanzin v. Tanvir*, 592 U.S. 43, 46 (2020); *see Loper Bright*, 603 U.S. at 412.

The Court previously found in *Dail v. Both, Inc.*, No. 2:23-cv-276, that Congress did not expressly delegate to the DOL the authority to define "engaged in an occupation." 29 U.S.C. § 203(t); *Dail v. Both, Inc.*, No. 2:23-cv-276, ECF No. 81 at 8–12. When Congress amended the FLSA to add the relevant language regarding tipped employees, it authorized "[the Secretary of Labor] to promulgate necessary rules, regulations, or orders with regard to [those] amendments." Pub. L. No. 89-601 § 602, 80 Stat. at 844. But that is not a delegation of authority to define terms in the FLSA.

*Cf. Kokinda*, 146 F.4th at 416 (recognizing that Congress delegated authority to interpret an undefined term when it directed the agency to "issue guidelines and regulations to *interpret* and implement" the statute) (emphasis added) (quotation marks and citation omitted). On the contrary, because courts have primary responsibility to interpret statutory text, an administrative declaration doing the same is not "necessary." Pub. L. No. 89-601, § 602, 80 Stat. at 844; *see Loper Bright*, 603 U.S. at 400.

The Court also previously determined that the best reading of the tip credit provision is not consistent with the Final Rule. *Dail v. Both, Inc.*, No. 2:23-cv-276, ECF No. 81 at 8–12. The Court looks to dictionary definitions to find the ordinary meaning of "engaged in an occupation." 29 U.S.C. § 203(t); *see Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566–69 (2012).

"Engaged" means "to employ or involve oneself" or "employed, occupied, or busy."[17] The same dictionaries define "occupation" as "[a]n activity or pursuit in which a person engages; esp[ecially] a person's usual or principal work or business" and "[a]n activity that serves as one's regular source of livelihood; a vocation."[18] None

---

[17] *Engage*, BLACK'S LAW DICTIONARY (12th ed. 2024); "to do (something)"; *Engaged In*, Merriam-Webster, https://www.merriam-webster.com/dictionary/engage%20in (last visited Jan. 26, 2026); *Engaged*, American Heritage Dictionary, https://ahdictionary.com/word/searc h.html?q=engaged (last visited Jan. 26, 2026).

[18] *Occupation*, BLACK'S LAW DICTIONARY (12th ed. 2024); "an activity in which one engages"; *Occupation*, Merriam-Webster, https://www.merriam-webster.com/dictionary/occupation (last visited Jan. 26, 2026); *Occupation*, American Heritage Dictionary, https://ahdictionary.com/word/se arch.html?q=occupation (last visited Jan. 26, 2026).

of these definitions place time limits on the word "engaged" that could be squared with the specificity in the Final Rule. Thus, the Court agreed with the Fifth Circuit's assessment:

> [B]eing "engaged in an occupation in which [the employee] customarily and regularly receives more than $30 a month in tips" cannot be twisted to mean being engaged in duties that directly produce tips [] or in duties that directly support such tip-producing duties (but only if those supporting duties have not already made up 20 percent of the work week and have not been occurring for 30 consecutive minutes) and not engaged in duties that do not produce tips.

*Rest. Law Ctr.*, 120 F.4th at 173 (quoting 29 U.S.C. § 203(t)) (other quotation marks omitted). Therefore, alleging that employees were frequently required to "perform manual, non-tipped labor for significantly more than 20% of relevant work periods" and to perform non-tipped cleaning duties for between "45 minutes to one and one-half hours" once monthly is not equivalent to alleging that employees were not "engaged in an occupation in which [they] customarily and regularly receive[d] more than $30 a month in tips," such that the plaintiff servers were entitled to the standard minimum wage without applying the tip credit. ECF No. 26 ¶¶ 1, 28; 29 U.S.C. § 203(t).

Put simply, the 80/20/30 Final Rule does not provide the best reading of "engaged in an occupation" within the FLSA tip credit provision. So while the second amended complaint alleges a violation of the Final Rule, that does not suffice to make out a claim for violation of the FLSA.

The plaintiffs assert that post-*Loper Bright*, courts should continue to give weight to an agency's "body of experience and informed judgment"—in this case, the DOL's "decades-long expertise in regulating tipped employment"—under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). ECF No. 33 at 10–13. According to the plaintiffs, the 80/20/30 Final Rule "is consistent, longstanding, and adopted through agency guidance backed by investigation and enforcement," and "reflects DOL's informed judgment about how to balance employer flexibility with worker protections." *Id*. That may all be true, but the Court would only reach the question of whether to defer to the DOL's experience if the Court needed the agency's help to determine the best reading of the FLSA. *See Loper Bright*, 603 U.S. at 412–13. But here, the text of the FLSA is unambiguous and does not include the timing requirements set forth in the 80/20/30 Final Rule. Because the Court does not need to look to the DOL's interpretation to inform its decision, *Skidmore* deference does not save the pleading insofar as it relies on the 80/20/30 Final Rule.

The plaintiffs correctly state that "[b]ecause *Auer* [*v. Robbins*, 519 U.S. 452, 461 (1997)] deals with a government agency's interpretation of its own regulations, as opposed to the interpretation of a statute, it is untouched by the elimination of *Chevron* deference in *Loper Bright*." ECF No. 33 at 9. "[I]f a *regulation* is ambiguous, the Court gives substantial deference to an agency's interpretation of its own regulation pursuant to *Auer*." *Romero v. Barr*, 937 F.3d 282, 290 (4th Cir. 2019) (emphasis added). But *Auer* does not apply here, as the Court is not tasked with interpretating one of the DOL's regulations—in this case, the 80/20/30 Final Rule—

but with interpreting the FLSA itself. Thus, pre-*Loper Bright* cases applying *Auer* deference to the 80/20/30 Final Rule do not help the plaintiffs.

Accordingly, the Court will grant the defendants' motion to dismiss the plaintiffs' minimum wage claims to the extent that they rely on the 80/20/30 Final Rule.

### iii.    Sharon Pitsilides's Status as an "Employer"

The defendants claim that the plaintiffs fail to plead sufficient details to support their assertion that Sharon Pitsilides was their employer, and thus able to be held personally liable. The FLSA and the VMWA define an "employer" broadly to include "any person[19] acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d); Va. Code § 40.1-28.9. To determine whether an employer-employee relationship exists under the FLSA, the Fourth Circuit applies the "economic reality" test.[20] *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 83 (4th Cir. 2016). The test focuses on "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of

---

[19] Under the FLSA, a "person" is an "individual, partnership, association, corporation, [or] business trust." 29 U.S.C. § 203(a). The VMWA includes this list of individuals and entities within the definition of "employer" rather than separately defining "person" to include them. Va. Code § 40.1-28.9.

[20] Because the analysis of employer status under the VMWA mirrors the analysis under the FLSA, it is appropriate to address Sharon Pitsilides's liability as an "employer" under the VMWA by applying the same economic realities test used in the FLSA context. *See Diaz v. Banh Cuon Saigon Rest., Inc.*, No. 1:16-cv-295, 2016 WL 9223925, at *5 (E.D. Va. Nov. 22, 2016) (stating that the definition of employer under the VMWA mirrors the FLSA's definition and the analysis is the same).

payment, and (4) maintained employment records." *Id.* (citing *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999)). No one factor is dispositive. *Id.*

"Most circuits to confront this issue have acknowledged . . . that a company owner, president, or stockholder must have at least some degree of involvement in the way the company interacts with employees to be a FLSA 'employer.'" *Irrizary v. Catsimatidis*, 722 F.3d 99, 107–10 (2d Cir. 2013) (collecting cases). As such, "[e]vidence that an individual is an owner or officer of a company, or otherwise makes corporate decisions that have nothing to do with an employee's function, is insufficient to demonstrate 'employer' status." *Id.* at 109. Rather, to be an "employer," an individual defendant must "exercise[] operational control over employees," meaning that "[their] role within the company, and the decisions it entails, directly affect the nature or conditions of the employees' employment." *Id.* at 110.

The plaintiffs go beyond pleading that Sharon Pitsilides was a mere owner or corporate officer. ECF No. 55-1 ¶¶ 14, 37. With respect to the first factor, the plaintiffs assert that Sharon Pitsilides "often actually" exercised the power to hire and fire employees it. *Id.* ¶ 33. Therefore, this factor weighs in favor of employer status.

Regarding the second factor—whether the alleged employer supervised and controlled employee work schedules or conditions of employment—the plaintiffs allege that Sharon Pitsilides oversees and is "closely familiar with" the restaurant's operations, to include employees' work schedules and employment conditions. ECF No. 55-1 ¶¶ 14, 33. Here again, the plaintiffs state that Sharon Pitsilides not only had the power to control employees' schedules and employment conditions, but that she

often actually exercised those powers. *Id.* ¶ 33. The plaintiffs state that Sharon Pitsilides "established . . . [the] server cash-requirement practices which applied to [the plaintiffs]" and the "uniform tipping practices and policies that unlawfully required servers to share their tips with ineligible coworkers." *Id.* ¶ 38. And when the plaintiffs asked their immediate supervisors to whom they should address grievances about tipping policies and practices, they were directed to Sharon Pitsilides. *Id.* ¶¶ 14, 37. Therefore, this factor weighs in favor of employer status.

The third factor—whether the alleged employer determined the rate and method of payment—likewise supports a finding of employer status. The plaintiffs state that Sharon Pitsilides had the power to "completely control" payroll practices, including by determining the rate and method of payment, and that she often actually exercised this power. ECF No. 55-1 ¶¶ 14, 33, 37–38. The plaintiffs offer that Sharon Pitsilides has been sued for violations of state and federal wage laws in the past and, as a result, has since exercised even "more direct control over payroll operations." *Id.* ¶ 37. And restaurant supervisors directed plaintiff servers to address their concerns about payroll practices to Sharon Pitsilides. *Id.*

As for the fourth factor—whether the alleged employer maintained employment records—the plaintiffs state that Sharon Pitsilides "established uniform payroll policies, plans and practices governing the tracking [and] recording" of the plaintiffs' compensation. ECF No. 55-1 ¶¶ 33, 38. The plaintiffs also state that Sharon Pitsilides is in possession of employment records that indicate "with [] precision" the

dates and times the plaintiffs worked. *Id.* ¶ 30. Therefore, this factor weighs in favor of employer status.

The defendants assert that the plaintiffs "fail[] to do anything more than recite a test's factors," but that is not accurate. ECF No. 29 at 5. Although no one factor of the economic reality test is dispositive, and all four factors need not be met, the plaintiffs allege facts sufficient to support Sharon Pisilides's employer status under each prong. Thus, the facts the Court outlined above as to Sharon Pitsilides's role allow this Court to plausibly infer that she supervised and controlled material conditions of employment—including the policies and practices central to this suit.

Accordingly, Sharon Pitsilides shall remain as an individual defendant in this case.

## C.    Motion to Certify a Class and Conditionally Certify a Collective

### i.    *Class Certification Under Fed. R. Civ. P. 23*

The Court declines to certify the proposed class because it is not readily ascertainable. *See EQT*, 764 F.3d at 358.[21] As the plaintiffs would define it (after

---

[21] The defendants do not raise ascertainability by name, and they do not cite *EQT*. But their opposition clearly opposes class certification based in part on "the need to examine individual employee circumstances and experiences." ECF No. 47 at 2 (tying that concept to the predominance and superiority requirements for class certification under Fed. R. Civ. P. 23(b)). Because ascertainability is a component of the Fed. R. Civ. P. 23(a) analysis, the plaintiffs must clear that hurdle before Rule 23(b) comes into play. So the Court considers the effect of individualized determinations—and the defendants' argument on that point—under the ascertainability rubric.

Additionally, the Court notes that the defendants' argument about individualized determinations was sufficient to put the plaintiffs on notice that they ought to address the issue—whatever the legal framework—which they do not do. *See generally* ECF No. 50.

dismissal of the inadequate theories, as described above), the proposed class includes all employees who suffered any of the three types of harm that survive under Fed. R. Civ. P. 12(b)(6). *See* ECF No. 42 at 13. The plaintiffs demonstrate that all the members of the putative class were subject to *policies* that resulted in those harms. *E.g.*, ECF No. 42-2 ¶ 8 ("Defendants had a policy and practice of disciplining servers . . . on whom diners had walked out without paying unless the server reimbursed the house.") (emphasis removed); ECF No. 42-1 ¶ 6 ("If you stained your shirt, you would be required to pay cash to replace it."). But they do not show that all or even most of the class members were actually made to pay cash for walkouts, uniforms, or any other restaurant property. *See* ECF No. 42 at 10 (asserting, without adequate record support,[22] that the named plaintiffs estimate between 10 and 30 percent of servers "had to pay cash out-of-pocket to pay for restaurant property"); *see also* ECF No. 50 at 13 (asserting, with no citation, that "[t]he total percentage of servers who either had to pay or to contribute their own money to pay for walkouts and who were required to pay cash for restaurant property almost certainly exceeded 75% of all servers"). As a result, the Court cannot find that an objectively defined group of

---

[22] Two of the plaintiffs state that they witnessed colleagues paying for walkouts "on multiple occasions," but that does not establish any specific number or percentage of employees harmed by the walkout policy. ECF No. 42-2 ¶ 8; ECF No. 42-3 ¶ 3. And there is at most evidence that two people had to pay for uniforms or restaurant property. ECF No. 42-4 ¶ 3 ("I [] had to reimburse the restaurant with my own cash to replace a lost digital time card."), 16 (identifying a second employee, "Zach Portillo," who may have suffered similar harm). It is not even clear under which theory— uniforms or restaurant property—the second person was harmed. *See id.* ¶ 16 ("Zach Portillo and I had to pay to replace Captain George's uniforms *or* property") (emphasis added).

workers constitutes a class for whom there is an alleged injury in common. Instead, to determine whether an individual could join the class, the Court would have to take evidence to find what type of harm—if any—each individual suffered.

The Court has an obligation to refine a problematic class definition if doing so could cure the problem without making the definition untenable for another reason. *EQT*, 764 F.3d at 360. But here, dividing up the plaintiffs' proposed class into sub-classes based on the three theories of harm that survive would not help.[23] At most, it would eliminate one factual determination the Court would have to make about each individual who sought to join the class—i.e., which type of harm they suffered. It would not resolve the fundamental problem that whether a prospective class member was harmed *at all* cannot be determined by reference to objective criteria. Nor would it cure the fact that the plaintiffs fail to carry their burden to produce evidence that any type of alleged injury remaining in the case is common to a group that *would* be ascertainable (e.g., all servers).

### ii. Conditional Certification of the FLSA Collective

Whether the plaintiffs meet the lower threshold for conditional certification of a collective under 29 U.S.C. § 216(b) turns on exactly what kind of 'similarity' the law requires. The plaintiffs demonstrate that all members of the putative collective were subject to the same policies about paying cash for walkouts, damaged uniforms, and other restaurant property. *See* ECF No. 42-2 ¶ 8 (describing the walkout policy); ECF

---

[23] The plaintiffs propose an alternative class definition that would capture only "servers . . . who paid or contributed to payment for diners who walked out of the restaurant without paying their tabs." ECF No. 50 at 11 n.10.

No. 42-1 ¶ 6 (describing the uniform policy); ECF No. 50-7 at 2 (list of prices for restaurant property). But that cannot be sufficient. If it were, then courts could conditionally certify FLSA collectives based on illegal policies that were never enforced.

Instead, the rule has to be that the plaintiffs must demonstrate that members of a putative collective are "similarly situated" as to the harm they suffered. 29 U.S.C. § 216(b). While that requirement is often satisfied with proof that the putative collective members were subject to the same illegal policy, the Court finds that the mere *existence* of such a policy, without more, is not enough. This interpretation is consistent with the practice of courts in this district. *See Purdham*, 629 F. Supp. 2d at 548 (requiring a "modest factual showing sufficient to demonstrate that [members of the putative collective] were victims of a common policy or plan that violated the law") (emphasis added); *Choimbol*, 475 F. Supp. 2d at 563 (same).

Under that standard, the Court finds that the plaintiffs do not make out an FLSA collective that is similarly situated. By choosing to roll together all its theories of unfair practices into a single FLSA claim, the plaintiffs ran the risk that the Court would eliminate the theories that made the putative collective members similarly situated (i.e., the tip pool and untipped labor), leaving a group of people who have individually suffered miscellaneous other harms or who are subject to the same policy but have not been harmed by those policies at all. That is what happened here.

At most, the plaintiffs show that there have been "multiple occasions" on which the walkout policy has been enforced against *someone* and that "several" servers were

made to pay for walkouts. ECF No. 42-2 ¶ 8. They do not prove how many people the policy has been enforced against or even whether that number constitutes a majority of the proposed collective. And at most, the plaintiffs provide evidence that the uniform and restaurant property policies were enforced against two people. *See supra* n.22.

The plaintiffs put on evidence that "[m]any [servers]" contributed money to help their coworkers made to pay cash for walkouts. ECF No. 42-2 ¶ 8; see ECF No. 42-3 ¶ 3. But the Court does not find that sufficient to establish the existence of a collective similarly situated as to harm caused by the defendants. While the decision to chip in and help others avoid discipline for walkouts may be a response to the defendants' broadly applicable policy, it does not situate the workers who contributed money to their coworkers similarly to the workers against whom the policy was actually enforced, because there is no evidence that the disciplinary policy was ever— or would have been—applied to the workers who only chipped in.

Because neither class certification nor conditional certification of the proposed collective would be proper in this case, the Court will not consider whether the plaintiffs satisfy the requirements of Fed. R. Civ. P. 23(b) or whether proposed class counsel is adequate under Fed. R. Civ. P. 23(g). The motion to certify a class and conditionally certify a collective will be denied.

## IV.    CONCLUSION

The plaintiffs' motion for leave to file a third amended complaint (ECF No. 54) is **GRANTED IN PART** and **DENIED IN PART**.

The defendants' partial motion to dismiss (ECF No. 28) is **GRANTED IN PART** and **DENIED IN PART**.

The plaintiffs' motion to certify a class and conditionally certify a collective (ECF No. 41) is **DENIED IN PART AS MOOT**, with respect to the theories of liability dismissed under Fed. R. Civ. P. 12(b)(6). With respect to the remaining theories, the motion to certify is **DENIED**.

The trial and final pretrial conference dates are **VACATED**, and all other deadlines in the Court's Scheduling Order (ECF No. 27)—as well as the deadline to reply to the motion for summary judgment, *see* ECF No. 77—are **STAYED** until further order of this Court.

The parties are **ORDERED** to contact the chambers of the Honorable Lawrence R. Leonard, at 757-222-7210, on or before January 30, 2026, to schedule a settlement conference.[24]

**IT IS SO ORDERED**.

_____ /s/ _____

Jamar K. Walker
United States District Judge

Norfolk, Virginia
January 27, 2026

---

[24] In the event this matter does not settle, the Court is inclined to order new briefing on the defendants' motion for summary judgment (ECF No. 69) but would likely hold a status conference with the parties before doing so.